## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Baker v. Raymond International, Inc.*, 656 F.2d 173, 1982 AMC 2752 (5th Cir. 1981)............8

*Brown v. Union Oil Co. of California*, 984 F.2d 674 (5th Cir. 1993)........7, 11, 17, 18, 21, 25

*Capps v. N.L. Baroid/NL Industries, Inc.*, 784 F.2d 615, 618 (5th Cir. 1986)............11, 22, 26

*Celotex Corp. v. Catrett*, 477 U.S. 317; 106 S.Ct. 2548 (1986).........................................5, 7

*Cosmopolitan Shipping Co. v. McAllister*, 537 U.S. 783, 1949 AMC 1031 (1949)..........7, 10

*Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1086-1088 (5th Cir. 1994)........................6, 7

*Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir. 1977)...............................................7, 8, 11, 21

*Hopper v. Frank,* 16 F.3d 92, 97-98 (5th Cir. 1994)..................................................................6

*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)..........................5, 6

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 888; 110 S.Ct. 3177, 3189 (1990)........................................................................................................................................5, 6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574; 106 S.Ct. 1348, 1355-1356 (1986)...............................................................................................................................5

*Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1244 (5th Cir. 1988)......7, 11, 17, 18, 21

*Minkota Powerloop Inc. v. Manitowoc Co.*, 669 F.2d 525 (8th Cir. 1981)...............................8

*Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969)..8, 9, 10, 11, 15, 17, 18, 23, 25, 26, 28, 29

*Ryan v. United States*, 331 F. Supp 2d. 371, 2004 AMC 2151 (D. Md. 2004)........................8

*Spinks v. Chevron Oil Co.*, 507 F.2d 216, 1979 AMC 1165 (5th Cir. 1975).............................8

*Wai v. Rainbow Holdings*, 2004 U.S. Dist. Lexis 25675 (D. Fl. 2004).....................................8

*Williams v. Arco Oil & Gas, Inc.*, 1990 WL 178722 (E.D. La. 1990)................................. 25

<u>Statutes</u>

F.R.C.P. 56.................................................................................................................5

<u>Treatises</u>

Norris, the Law of Seaman, 4th Ed., § 30.14.............................................................8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

ROBERT MANUEL                    :   CIVIL ACTION DOCKET NO. 08-00605

VERSUS

MCDERMOTT GULF OPERATING     :   JUDGE DOHERTY/MAGISTRATE HILL
COMPANY, INC., ET AL LLC
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Defendants, **CON DIVE, LLC,  LLOG EXPLORATION COMPANY, INC.,**

**LLOG EXPLORATION OFFSHORE, INC., LLOG EXPLORATION &**

**PRODUCTION COMPANY AND LLOG ENERGY, LLC**, (Collectively "defendants")

submit this Memorandum in Support of its Motion for Summary Judgment against the

plaintiff, Robert Manuel, contending that there is no genuine issue of material fact in dispute

and that defendants are entitled to summary judgment as a matter of law, since, pursuant to

the Jones Act, plaintiff was not a "borrowed servant" of any of the defendants mentioned

above herein.  Plaintiff's Jones Act claim should be dismissed with prejudice and at

plaintiff's cost since he cannot demonstrate that he had an employment connection with any

company other than his own employer, Tesla Offshore, LLC.

## BACKGROUND

Plaintiff, Robert Manuel, originally filed suit on May 5, 2008 following injuries allegedly sustained on or about November 26, 2006, while working aboard the DSV/THEBAUD SEA ("Thebaud Sea").[1]  Plaintiff alleges that defendants collectively, "owned, operated, managed, and controlled the Thebaud Sea," which plaintiff additionally asserts is unseaworthy as a result of defendants' alleged failure to provide a safe work environment.[2]  At the time of the alleged incident at issue, on or about November 26, 2006, plaintiff was employed by Tesla Offshore, LLC ("Tesla") as a surveyor, assigned to work aboard the Thebaud Sea.[3]  At all pertinent times herein, Con Dive, LLC ("Con Dive") served as the time charterer of the Thebaud Sea through its time charter agreement with Secunda Atlantic, Inc., the owner of the vessel.  Plaintiff claims entitlement to damages pursuant to the Jones Act since he was assigned to work as a surveyor aboard the Thebaud Sea, contributing to its mission and purpose.[4]  Plaintiff further asserts that although he was a "direct employee of [Tesla]", he was also the "borrowed servant, joint employee, or sub-agent of the defendants" named in his Original Petition for Damages.[5]  Defendants submit, however, pursuant to jurisprudence interpreting Jones Act "borrowed servant" status, that

---

[1] See plaintiff's Original Petition for Damages [*Doc. No. 1, paras. 10-13*], filed May 5, 2008.

[2] *Id.*

[3] *Id.* [*Doc. No. 1, paras. 7-8*].

[4] *Id.* [*Doc. No. 1, paras. 9 and 14*].

[5] *Id.* [*Doc. No. 1, para. 7*].

plaintiff was never considered a "borrowed servant" of any of the defendants who submit this Motion, and that summary judgment is thus warranted in this matter since plaintiff will be unable to demonstrate his necessary burden.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, and the jurisprudence interpreting the same, mandate the dismissal of claims when a party is unable to come forward with evidence to support the claims or defenses upon which he will have a burden of proof at trial.[6]

The United States Supreme Court has held that summary judgment must be granted where appropriate.[7]  The purpose of Rule 56 is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues."[8]  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the non-moving party's case.[9]

---

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317; 106 S.Ct. 2548 (1986).

[7] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574; 106 S.Ct. 1348, 1355-1356 (1986).

[8] *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3189 (1990); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

[9] *Celotex*, 106 S.Ct. at 2553.

If the movant meets the above burden, the non-movant must then demonstrate specific facts showing there is a genuine issue for trial to defeat summary judgment.[10]  The non-movant's burden is not satisfied with some metaphysical doubt as to the material facts,[11] by conclusory allegations,[12] by unsubstantiated assertions, [13] or by only a scintilla of evidence.[14] Although the Court must resolve factual controversies in favor of the non-movant, it must do so only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.[15]  "[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant."[16]  A litigant should not be required to wait indefinitely for a trial when the other party has a meritless legal position that can be resolved on a motion for summary judgment.[17]

---

[10] *Id*. at 2554.

[11] *Matushita*, 106 S.Ct. at 1356.

[12] *Lujan*, 110 S.Ct. at 3180.

[13] *Hopper v. Frank*, 16 F.3d 92, 97-98 (5th Cir. 1994).

[14] *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1086-1088 (5th Cir. 1994).

[15] *Little*, 37 F.3d at 1075.

[16] *Id*.

[17] *Id*.

To defeat summary judgment, the non-movant has to make a showing sufficient to establish the putative existence of every element that is essential to his case.[18]  In other words, the non-movant must present a *prima facie* case, or there can be no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the non-movant's case necessarily renders all other facts immaterial.[19]

Under these principles, it is clear that this case is proper for the granting of a motion for summary judgment in favor of these movants.

## LAW AND ARGUMENT

### A.     THE BORROWED EMPLOYEE DOCTRINE

The Supreme Court has held that actions pursuant to the Jones Act may only be brought against the seaman's employer, and that a seaman may only have one employer for Jones Act purposes.[20]  The Fifth Circuit has consistently held that a "borrowing employer", however, may be deemed the seaman's employer for purposes of Jones Act recovery. Borrowed servant status is a question of law[21] and requires resolution by the fact finder.[22] When an employee is "loaned to another employer who exercises control over the employee's

---

[18] *Celotex*, 106 S.Ct. at 2552.

[19] *Davis*, 14 F.3d. at 1085.

[20] *Cosmopolitan Shipping Co. v. McAllister*, 537 U.S. 783, 1949 AMC 1031 (1949).

[21] *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1244 (5th Cir. 1988).  See also *Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir. 1977), *Cert. denied*, 536 U.S. 913 (1978).

[22] *Brown v. Union Oil Co. of California*, 984 F.2d 674 (5th Cir. 1993).

activities, the borrowing employer may be considered the only employer, placing liability on the actual employer rather than the nominal employer.[23]  Thus, an employee may seek damages pursuant to the Jones Act against the company that was directing his work; no action will exist against the nominal employer.[24]  Defendants, however, affirmatively aver that at all pertinent times herein plaintiff was soley the employee of his primary employer, Tesla.  Plaintiff was not a "borrowed employee", joint employee, or sub-agent of any company other than Tesla.

The Fifth Circuit has established a test to guide courts in determining whether an employee was a "borrowed employee" in order to recover under the Jones Act.  In *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969), where plaintiff sought recovery from his employer's fellow subcontractor, the Fifth Circuit considered the following test in determining whether the employee was a "borrowed employee" for purposes of the Jones Act:

> (1)    Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
>
> (2)    Whose work is being performed?

---

[23] See e.g. *Minkota Powerloop Inc. v. Manitowoc Co.*, 669 F.2d 525 (8th Cir. 1981); *Wai v. Rainbow Holdings*, 2004 U.S. Dist. Lexis 25675 (D. Fl. 2004); *Ryan v. United States*, 331 F. Supp 2d. 371, 2004 AMC 2151 (D. Md. 2004); *Baker v. Raymond International, Inc.*, 656 F.2d 173, 1982 AMC 2752 (5th Cir. 1981); *Gaudet v. Exxon*, 562 F.2d 351, 1978 AMC 591 (5th Cir. 1977); Norris, The Law of Seaman, 4th Ed., § 30.14.

[24] See *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969); *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 1979 AMC 1165 (5th Cir. 1975).

     (3)     Was there an agreement, understanding, or meeting of minds between the original and borrowing employer?

     (4)     Did the employee acquiesce in the new work situation?

     (5)     Did the original employer terminate his relationship with the employee?

     (6)     Who furnished the tools and place for the performance of worker's activities?

     (7)     Was the new employment over a considerable length of time?

     (8)     Who had the right to discharge the employee?

     (9)     Who had the obligation to pay the employee?

The plaintiff in *Ruiz*, an employee of Zenith Inc. ("Zenith"), brought suit against his employer's contractor ("Shell") and fellow subcontractor ("National") pursuant to the Jones Act.[25]  Zenith had contracted with Shell to perform welding services on a tank which was constructed and sold to Shell by National, and aboard Shell's barge at the time of the alleged accident.  Plaintiff brought suit against both National and Shell after he was allegedly injured by a hydraulic jack aboard the barge.  National argued that plaintiff was its "borrowed employee", in which case the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.§ 901 et. seq, would provide recovery.[26]  In concluding that plaintiff was not a "borrowed employee" of National, the Court reasoned that: (1) Zenith never relinquished

---

[25] *Ruiz*, 413 F.2d at 312.

[26] *Id.*

control of its employee, rather, Zenith and National cooperated with each other for Shell's benefit; (2) National never exercised control over plaintiff, even though plaintiff was potentially directed by both Zenith and National's employees; (3) the contract between Zenith and National provided that "Zenith conduct all operations in its own name as an independent contractor . . ."; (4) and that there was no agreement between National and Zenith providing a borrowed employee relationship.[27]

Nearly every factor set forth by the mandates of *Ruiz* indicates that plaintiff was not a "borrowed employee" of any named defendant set forth herein, but was rather soley the employee of Tesla Offshore, LLC.  Accordingly, since the Supreme Court has held that actions pursuant to the Jones Act may only be brought against the seaman's employer,[28] plaintiff's claim against defendants should be barred since plaintiff was not a "borrowed employee".

## B.   PLAINTIFF WAS NOT A BORROWED EMPLOYEE OF ANY DEFENDANT NAMED HEREIN

Generally, the question of borrowed employee status is a question of law for the court to determine.[29]  In some cases, however, factual disputes must be resolved before the district

---

[27] *Id*. at 313.

[28] *Cosmopolitan Shipping Co. v. McAllister*, 537 U.S. 783, 1949 AMC 1031 (1949).

[29] *Billizon v. Conoco, Inc*., 993 F.2d 104, 105 (5th Cir. 1993).

court can make a legal determination.[30]  An analysis under the mandates of *Ruiz*, and the jurisprudence interpreting this issue, clearly demonstrates that summary judgment is warranted herein since plaintiff was not a "borrowed employee".

**1.      Tesla exercised control over plaintiff's work.**

Although courts should discuss each element separately, no single factor or any combination is determinative of borrowed servant status.[31]  The Fifth Circuit, however, has consistently emphasized that the presence of the first *Ruiz* factor, control, is indicative of a "borrowed employee" relationship.[32]  To determine who has control over the employee, "the court is required to distinguish between authoritative direction and control, and mere suggestions as to details, or necessary cooperation where the work furnished is part of a larger undertaking."[33]  In the present matter, plaintiff was a payroll employee of Tesla,

---

[30] *Id.* (citing *Brown*, 984 F.2d 674, 679 (5th Cir. 1993) and *Melancon*, 834 F.2d 1238, 1245 n. 13 (5th Cir. 1988), reh'g granted on other grounds, 841 F.2d 572 (5th Cir. 1988)).

[31] *Brown,* 984 F.2d at 676.

[32] *Melancon*, 834 F.2d 1244-1245; *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969) (citing *Standard Oil Co. v. Anderson*, 212 U.S. 215 (1909)); *Capps v. N.L. Baroid*, 784 F.2d 615 (5th Cir. 1986). Some courts, however, have de-emphasized control.  See e.g. *Gaudet v. Exxon*, 562 F.2d 351, 1978 AMC 591 (5th Cir. 1977) ("The principle focus within the Ruiz test should be the questions of (1) who was responsible for the working conditions experienced by the employee and the risks inherent therein, and (2) was the employment with the new employer of such duration that the employee could reasonably be presumed to have evaluated the risks of the work situation and acquiesced thereto[.]").  Id. at 357.

[33] *Ruiz*, 413 F.2d at 313 (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215 (1909)).

performing his duties aboard the Thebaud Sea as a Tesla surveyor.  Plaintiff was performing Tesla's work, providing surveying services to Con Dive and the LLOG entities.   His testimony provides:[34]

> Q:   Okay.  Now what type of work did you do at Tesla?
>
> A:   I was a surveyor.
>
> Q:   Did you do this work on land or over water or both?
>
> A:   On water.
>
> Q:   Why don't you tell me, briefly, the type of work you were doing on water for Tesla?
>
> A:   We were more or less sent out there to position the boats we were put on.

Plaintiff received his work assignments through his employer, Tesla, indicating that Tesla retained control over plaintiff's employment operations with companies whom he was assigned.[35]

> Q:   Let me ask you more specifically about this particular work.  How would you get your work assignments, Robert, while you were with Tesla?
>
> A:   They would send them to me - - well, before we would go we would meet at the office and we had our conference.  And they would give us a work package and then we would leave with a work package.

---

[34] Excerpts from the deposition of plaintiff, Robert Manuel, taken April 20, 2010, attached hereto as Exhibit "A".  See Exhibit A, pg. 15, lns. 21-25, pg. 16, lns 1-7.

[35] See Exhibit A, pg. 16, lns. 8-20.

> Q:     Okay, and then if you had to go to some dock to catch a boat, is that what you would do?
>
> A:     Correct.  They would drive us to the boat landing.

Furthermore, Tesla remained in full contact with its employee during the course of his placement aboard the Thebaud Sea.  Plaintiff was in contact with Aaron Duke, his supervisor at Tesla, demonstrating that Tesla retained a working authoritative relationship with its employee.  Plaintiff's deposition provides:[36]

> Q:     Were you calling into the office every morning or afternoon to tell Aaron or somebody else what was going on on a daily basis?
>
> A:     If something would go wrong with a piece of equipment or something, we would, but basically until something would happen, we wouldn't ever call you know.  They'd call us sometimes and check on us because they knew our position.  In Baton Rouge, they could see us on computer, so they knew where we were all the time.

As indicated by plaintiff's testimony, Tesla called in to the vessel to check on its employees, and even tracked the vessel's progress from a computer on land.  Plaintiff's testimony further provides:[37]

> Q:     Did you make any calls in to Tesla during your hitch on the Thebaud Sea in the days before your accident or anything?
>
> A:     Yes, I did.

---

[36] Excerpts from the deposition of plaintiff, Robert Manuel, taken April 30, 2010, attached hereto as Exhibit "B".  See Exhibit B, pg. 69, ln. 25,  pg. 70, lns. 1-10.

[37] See Exhibit B, pg. 70, lns. 11-24.

Q:     What did you call them about?

A:     One of the surveyors that was on the boat with me when
       I first got there, the captain, Dave . . . with Con Dive,
       they walked up to me and told me they wanted a surveyor
       off the boat in the morning, to be put off the boat in the
       morning.  And that's why I used the phone to call my
       supervisor.

When positioned with Con Dive's request to have a fellow surveyor removed from the

vessel, plaintiff first contacted his employer, Tesla, to address the situation, since Tesla

retained control over its employees during the performance of their work aboard the Thebaud

Sea.  Plaintiff further testified that he had minimal contact with the captain of the vessel,[38]

he recorded his time on forms provided by Tesla,[39] once he arrived on land, he was picked

up by a Tesla representative,[40] he operated only equipment supplied by his employer,[41] he

recorded weather conditions on Tesla's daily reports,[42] and when undersigned asked plaintiff

about his work schedule, plaintiff responded that, "that would be left up to [him]self or

Tesla."[43]

        Plaintiff provided services pursuant soley to Tesla's agreement with Con Dive.  No

other party, besides Tesla, exercised control over plaintiff's activities.  Furthermore, even if

---

[38] See Exhibit B, pg. 14, lns. 17-25, pg. 15, ln. 1.

[39] See Exhibit B, pg. 11, lns. 12-25.

[40] See Exhibit B, pg. 56, lns. 6-25.

[41] See Exhibit A, pg. 16, lns. 21-25, pg. 17, pg, 18, lns. 1-4.

[42] See Exhibit B, pg. 87, lns. 3-4.

[43] See Exhibit B, pg. 7, lns. 3-10.p

plaintiff took some direction from other employees aboard the Thebaud Sea, this direction was taken in cooperation of successfully completing the task at issue. Such cooperation does not amount to a finding of borrowed employee status.[44] While Manuel may have cooperated with the vessel crew, Tesla retained sole control over Manuel's activities. Similar to the *Ruiz* plaintiff, the suggested borrowing employer exercised no control over the employee since plaintiff's employer, Tesla, retained complete authoritative control over him during the course of his work aboard the Thebaud Sea. This factor weighs against finding in favor of borrowed employee status.

### 2.      Plaintiff performed Tesla's work as a surveyor.

At all pertinent times herein, plaintiff was employed by Tesla as a surveyor performing services aboard the Thebaud Sea. The Con Dive and LLOG defendants were engaged in offshore diving operations, tying in pipeline.[45]

> Q:      What type of work were they doing?
>
> A:      They were doing different things, sir. They were tying in the pipelines. Mainly that's what we were out there for.
>
> Q:      Thats what I wanted to know. It was a pipeline job instead of a salvage job or something?
>
> A:      Yes, sir.

_____

[44] *Ruiz*, 413 at 313 (quoting *Standard Oil Co. v. Anderson* ,212 U.S. 215 (1909)).

[45] See Exhibit B, pg. 13, lns. 18-24.

Con Dive and LLOG retained Tesla to position the vessel in the proper location above the pipeline site.[46]  Plaintiff was not engaged in any diving operations or pipeline tying as were the other employees on the Thebaud Sea.  Plaintiff only operated equipment supplied by his employer,[47] Tesla, and would report to Tesla if he encountered any problems aboard the Thebaud Sea.  Furthermore, the Tesla equipment was operated by Tesla employees only; no other members of the vessel crew operated plaintiff's equipment.[48]  Since plaintiff was engaged only in the positioning/surveying work of his employer, Tesla, this factor weighs against finding that plaintiff was a borrowed employee of any of the other entities aboard the Thebaud Sea.

> **3.    The Tesla/Con Dive Master Service Agreement indicates that Tesla was an independent contractor whose employees were not considered employees or servants of Con Dive.**

Here, the parties entered into a Master Service Agreement, agreeing that Tesla was considered an independent contractor.  With regard to paragraph 2. (INDEPENDENT CONTRACTOR), the Master Service Agreement provides:[49]

> It is expressly understood that the Contractor [(Tesla)] will be an independent Contractor and that neither Contractor nor contractors principles, partners, employees, or subcontractors are servants, agents, or employees of Company [(Con Dive)].

---

[46] See Exhibit B, pg. 9-10.

[47] See Exhibit A, pg. 16, lns. 21-25, pg. 17, pg, 18, lns. 1-4.

[48] See Exhibit A, pg. 17, lns. 22-25, pg. 18, lns. 1-4.

[49] The Tesla/Con Dive Master Service Agreement is attached hereto as Exhibit "C".  See Exhibit C, para. 2.

> Company is interested only in the results obtained and has only
> the general right of inspection and supervision in order to secure
> the satisfactory completion of any work or services. . . Company
> will not have the right to control or direct the details of the work
> performed by the Contractor.

At all pertinent times herein, Tesla was considered an independent contractor of Con Dive.  Neither Telsa or its employees were to be considered servants, agents, or employees of Con Dive.  Furthermore, the Master Service Agreement specifically stipulates that Con Dive will not have the right to control the details of Tesla's work, affirmatively prohibiting Con Dive from controlling the activities of Tesla's employees, including plaintiff, Robert Manuel.  In *Ruiz* the Court found that a similar provision disfavored finding borrowed servant status since the Contract stipulated that plaintiff's employer was to be considered an independent contractor.[50]  The language of the present Agreement denotes a shared cooperation between Con Dive and Tesla which does not suggest the presence of a  borrowed employee relationship.

While courts assessing similar provisions have reasoned that  borrowed employee status can be found where, "the workplace realities are otherwise,"[51] the workplace realties under the present facts weigh against finding that plaintiff was a borrowed employee since nearly every  *Ruiz* factor favors finding that plaintiff was not a  borrowed employee of any company or entity present on the vessel.  The parties agreed that Tesla's role with regard to

---

[50] See *Ruiz*, 43 F.2d at 313.

[51] See e.g. *Robertson v. W&T Offshore, Inc.*, 2010 WL 1956706, 8-9 (W.D. La.); *Brown*, 984 F.2d 674, 679 (5th Cir. 1993);  *Melancon*, 834 F.2d at 1246.

the operations on November 26, 2006, the date plaintiff allegedly sustained injuries aboard the Thebaud Sea, was that of an independent contractor.[52]  Additionally, the actual working realties of the operations aboard the Thebaud Sea indicate no suggestion that plaintiff was to be considered a borrowed employee of any named defendant since, at all relevant times, plaintiff remained under the sole control of his employer, Tesla.  As per the Master Service Agreement, the parties stipulated that Tesla's employees were not to be considered servants, agents, or employees of Con Dive, and the work place realities do not suggest otherwise.  As such, this factor also disfavors finding borrowed servant status under the present facts.

### 4.    Plaintiff did not acquiesce in the new work situation.

The fourth *Ruiz* factor centers on whether the employee "was aware of his work conditions and chose to continue working in them."[53]  Courts assessing this factor have considered the amount of time spent aboard the vessel, and the worker's appreciation of, and acquiesce in, his new work conditions.[54]  Where courts have found this factor weighing in favor of borrowed employee status, the plaintiff has ordinarily spent a considerable amount

---

[52] See Exhibit C, para. 2.

[53] *Brown* , 984 F.2d 678 (citing *Melancon*, 834 F.2d at 1246).

[54] See e.g. *Robertson*, 2010 WL 1956 706, 8-9.

of time aboard the vessel, eating, sleeping and working in the field.[55]  However, under the current facts of this matter, the plaintiff initially testified that he was aboard the Thebaud Sea for less than one week.[56]

> Q:    Prior to this job had you ever been on the boat that you were on at the time of your accident, which I understand was the THEBAUD SEA?  Had you ever been on that boat before?
>
> A:    No, Sir.
>
> Q:    So this was the only time you'd ever worked for Con Dive and the only time you had ever been aboard the THEBAUD SEA?
>
> A:    That's correct.

Plaintiff's supplemental deposition further provides:[57]

> Q:    Can you tell me, Robert, how many days you had been aboard the THEBAUD SEA before November 26, 2006?
>
> A:    Oh, that's going to be hard.  I would have to have my time sheets in front of me to give you a correct count, sir.
>
> Q:    Do you think you had been on it more than a week?
>
> A:    I would say a week would be the stopping point before we went back out, yes.

---

[55] *Id*. at 12.

[56] See Exhibit A, pg. 28, lns. 2-10.

[57] See Exhibit B, pg. 6, lns. 7-22.

Plaintiff initially testified that his time aboard the Thebaud Sea was less than one week, however, he later testified in his April 30, 2010 deposition, that he had in fact been aboard the vessel previously.[58]

> Q:   I need to know how many times you were on this boat, okay?  And you say you went out one time and did a job for two weeks is that correct?
>
> A:   That's correct, sir.
>
> Q:   Then you came in?
>
> A:   Right, that's one time.
>
> Q:   All right.  And then you told me that now you went out a second time, correct?
>
> A:   Correct, that's two times.
>
> Q:   And you were on there for whatever, the four or five days, and then your accident happened, correct?
>
> A:   Correct.
>
> Q:   Are those the only two times in your employment with Tesla that you were on that vessel, to your knowledge?
>
> A:   No, sir.
>
> Q:   How many times had you been on this vessel in your employment with Tesla?
>
> A:   Six or seven times.
>
> Q:   And over how long a period of time?

---

[58] See Exhibit B, pg. 126, lns. 8-25, pg. 127, lns. 1-12.

> A:    A month and a half maybe, a month.  You know, that's -
> - I can't tell you that to the day because I don't have my
> log in front of me.

As per plaintiff's testimony, his time spent aboard the Thebaud Sea consisted of sporadic periods over the course of approximately one month.  Courts have, however, generally required a more substantial presence for plaintiff to have acquiesced in the new work situation.[59]  The Fifth Circuit for instance has confirmed borrowed employee status where plaintiff's work consisted of at least one year.[60]  In *Brown v. Union Oil Co. of California*, 984 F.2d 674 (5th Cir. 1993), noting that longer periods are generally required to confirm this factor, the Court found a one month period satisfactory.[61]  In *Brown*, however, the plaintiff worked, slept, and ate on defendants premises, in its employ, for a full consecutive month.  Here, however, plaintiff's sporadic presence aboard the Thebaud Sea is not sufficient to establish that he acquiesced in the new work situation.  Furthermore, his testimony is inconsistent as to the amount of time actually spent aboard the vessel.  At most, plaintiff's testimony provides that he spent short periods aboard the Thebaud Sea over the course of one month, which is certainly not enough to demonstrate that his time spent aboard the vessel was

---

[59] See e.g. *Alexander v. Chevron, U.S.A.,* 806 F.2d 526, 527 (5th Cir. 1986); *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1241 (5th Cir. 1988); *Gaudet*, 562 F.2d at 355.

[60] See *Alexander,* 806 F.2d at 527.

[61] *Brown v. Union Oil Co. of California*, 984 F.2d 674, 678 (5th Cir. 1993).

"considerable" as required by jurisprudence.[62]  Since plaintiff's time aboard the Thebaud Sea was minimal, this factor also disfavors finding that plaintiff was a borrowed employee.

### 5.   At no point did Tesla terminate plaintiff's employment.

With regard to this factor, the Fifth Circuit has held that, "it is not necessary that the lending employer completely sever its relationship with the employee," since such a requirement would effectively eliminate the borrowed employee doctrine as there never could be two employers.[63]  "Instead, the focus should be on the lending employer's relationship with the employee during the employee's period of employment by the borrower."[64]  Under the present facts, plaintiff remained, at all times, an active Tesla employee who kept in regular contact with his employer throughout the course of his work conducted aboard the Thebaud Sea.  Specifically, he kept in regular contact with Tesla through his supervisor, Aaron Duke.[65]  Moreover, when Con Dive sought to release a fellow Tesla surveyor, Manuel first contacted his employer, Tesla, to determine what steps should be taken to address the situation, further indicating that Tesla intended to retain control of its employees.[66]  At all pertinent times, plaintiff retained a working relationship with his employer, Tesla, and remained in regular contact with Tesla's offices during his performance of Tesla's work aboard the Thebaud Sea.

---

[62] See *Id.*

[63] *Capps,* 784 F.2d at 617.

[64] *Id.* at 618.

[65] See Exhibit B, pg. 69, ln. 25,  pg. 70, lns. 1-10.

[66] See Exhibit B, pg. 70, lns. 11-24.

If Tesla's tools malfunctioned or were damaged during plaintiff's use aboard the vessel, plaintiff would contact Tesla to resolve the issue.[67]  Tesla maintained a full time working relationship with Robert Manuel during the relatively brief period in which plaintiff was assigned to the Thebaud Sea, working in cooperation with other members of the vessel's crew. Similarly, in *Ruiz*, where the same co-operative effort was present, the Court found that plaintiff's employer had not relinquished its control of him, and found that plaintiff was not a borrowed employee.[68]  Since Tesla did not relinquish control over its employee, and rather exercised full control over plaintiff throughout the course of his assignment, this factor also disfavors finding that plaintiff was a borrowed employee.

### 6.     Tesla, plaintiff's employer,  furnished his tools for the performance of his surveying duties aboard the Thebaud Sea.

Manual was involved in specialized work as a surveyor for Tesla.  He testified that no other employees aboard the Thebaud Sea operated his equipment which was supplied by Tesla and brought by plaintiff to the job site.[69]  He operated no equipment other than his own, and did not participate in any diving or pipeline related activities.  Plaintiff's testimony provides:[70]

> Q:     And then explain to me what you would do after that.
> Once you got to the boat landing, what would you have
> to do?

---

[67] See Exhibit B, pg. 69, ln. 25,  pg. 70, lns. 1-10.

[68] *Ruiz*, 413 F.2d at 313.

[69] See Exhibit A, pg. 16, lns. 21-25, pg. 17, pg, 18, lns. 1-4.

[70] *Id.*

A:      We would have to hook up all of the equipment.

Q:      This was Tesla equipment?

A:      [Yes].

Q:      And so as far as the equipment that you used while you were working for Tesla on these jobs, you used Tesla's equipment, correct?

A:      Yes, Sir.

Q:      You brought that equipment with you, correct?

A:      Yes, Sir.

Q:      Would you consider that to be specialized survey equipment?

A:      Yes, Sir.

Q:      Only Tesla employees would operate the equipment that was on board these boats that yall brought out there.  Is that correct?

A:      . . . why yes.

Q:      None of the boat personnel would operate your equipment?

A:      No, Sir.

Plaintiff's testimony provides that he personally transported the equipment he used aboard

the Thebaud Sea, and that equipment was provided soley by his employer, Tesla.  Since

plaintiff performed his duties operating equipment supplied only by Tesla, this factor also weighs against finding that plaintiff was a borrowed employee of Con Dive, or for that matter, any other movant named herein.

**7.     Plaintiff's suggested "employment" was not considerable in time.**

As discussed herein, plaintiff's testimony is inconsistent as to the actual amount of time spent aboard the Thebaud Sea as a "borrowed employee". His testimony provides that he has spent, at most, short periods aboard the Thebaud Sea over the course of one month.[71] As previously noted, Courts generally require a longer period of time to provide for borrowed servant status. For example in *Williams v. Arco Oil & Gas, Inc*., 1990 WL 178722 (E.D. La. 1990), the Court found that six months was a "significant length of time" to provide for borrowed servant status with regard to this factor.[72] Also, in *Brown*, although the Court found the one month of consecutive work sufficient to establish the fourth *Ruiz* factor (whether the employee acquiesced in the new work situation) the Court also found the one month period insufficient to weigh in favor of the present factor.[73] "In the case where the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the converse is not true."[74] Plaintiff worked sporadically aboard the Thebaud Sea over the course of one month. Since jurisprudence generally

---

[71] See Exhibit B, pg. 126, lns. 8-25, pg. 127, lns. 1-12.

[72] *Williams v. Arco Oil & Gas, Inc*., 1990 WL 178722, 2 (E.D. La. 1990).

[73] *Brown,* 984 F.2d at  678.

[74] *Id*. at 618.

requires a more substantial period to satisfy this factor, plaintiff cannot be deemed a borrowed employee and is thus barred from pursing action under the Jones Act.

### 8. Tesla retained sole authority to terminate its employees.

Although there was no indication that Con Dive intended to terminate plaintiff's work aboard the Thebaud Sea, defendants affirmatively submit that had the vessel crew decided to terminate plaintiff, Con Dive would have had to discuss this potential termination with plaintiff's employer, Tesla.  Concerning this factor, "the proper focus is not whether the borrowing employer can discharge the employee from his original employment, but whether the borrower has the right to terminate the employee's services with itself.[75]  In fact, plaintiff has testified that he contacted Tesla, not Con Dive, to determine the appropriate measures to take when Con Dive sought to terminate another Tesla surveyor.[76]  Furthermore, any relationship plaintiff has with Con Dive is through his employer's (Tesla) relationship with Con Dive through the Master Service Agreement.  This factor also weighs against finding in favor of borrowed employee status since Tesla retained sole authority to terminate plaintiff's employment.

### 9. Who was obligated to pay plaintiff?

The last Ruiz factor, concerning who was obliged to pay Manuel, also disfavors the finding of borrowed servant status since Tesla was plaintiff's payroll employer.[77]

---

[75] *Capps* at 618.

[76] See Exhibit B, pg. 70, lns. 11-24.

[77] See Exhibit A, pg. 65, lns. 10-25, pg. 66, lns. 1-6.

Q:     While you were employed by Tesla, and we'll just talk about November of 2006, how were you paid by them? Did you get a salary plus bonuses, or was it just straight salary?  What was the arrangement?

A:     It's kind of hard.  We got like three or four different kinds of pays with Tesla.

Q:     Give us the list.

A:     You got shop pay, you got offshore pay.

Q:     So when you were working, you were either on shop time or offshore time, correct?

A:     Correct.

Q:     And that determined how Tesla's customers were billed, depending on what you were doing at the time, correct?

A:     Correct, yes.

Additionally, plaintiff was guaranteed a set amount of money every two weeks, regardless of whether he worked any amount at all, whether it be aboard the Thebaud Sea or any other vessel.[78]

Q:     Now, between you and Tesla, was there some sort of arrangement about, Rob, you're going to get paid X dollars a month or a year in salary, and then you're eligible for bonuses or something like that? How did that work?

A:     When I was hired, they just gave me more or less a holding.  Like they'll say, we'll guarantee you X amount of dollars a month if you don't work a day at all.

---

[78] See Exhibit A, pg. 66, lns7-20.

> Q:      What was that threshold or that base pay when you
>           started with them in 05'?
>
> A:      Thirteen, Fourteen Hundred Dollars, I don't know [,
>           every two weeks].

Plaintiff was paid by his employer, Tesla, whom was obligated to pay plaintiff a base pay every two weeks, regardless of the amount of hours worked by the plaintiff in his duties as a surveyor.  As such, this factor also weighs in favor of denying borrowed employee status.

## CONCLUSION

Each and every factor set forth in *Ruiz* weighs in favor of finding that plaintiff is not a borrowed employee.  The facts of this matter overwhelmingly indicate that for purposes of his Jones Act claim, plaintiff is unable to demonstrate that he is a borrowed employee, entitling him to damages.  Plaintiff's employer, Tesla, at all times, retained active control of its employee, including in that control the obligation to pay his wages, supply his tools, and discharge him in the event his work was deemed insufficient.  As per the Master Service Agreement, Tesla was also obligated to conduct itself as an independent contractor, and its employees were not subject to the relinquishment or control of Con Dive.  At all pertinent times, plaintiff performed the work of his employer, Tesla, aboard the Thebaud Sea for the minimal period set forth herein.  Summary Judgment is therefore appropriate in this matter since plaintiff can present no material facts suggesting he was a borrowed employee.

For all aforementioned reasons, defendants' Motion for Summary Judgment should be granted, and plaintiff's claims against these defendants pursuant to the Jones Act should

accordingly  be dismissed since plaintiff cannot meet the judicial standard set forth in *Ruiz* and the jurisprudence interpreting the same.  Since plaintiff cannot demonstrate, as per *Ruiz*, that he is a borrowed servant, any Jones Act claim pursued by plaintiff against these defendants should be accordingly dismissed.

Respectfully submitted,

DAIGLE RAYBURN LLC

BY:   **/s/ *J. Daniel Rayburn, Jr.***
SUSAN A. DAIGLE - #4459
J. DANIEL RAYBURN, JR. - #11404 (T.A.)
303 W. Vermilion Street, Ste. 210
P.O. Box 3667
Lafayette, Louisiana  70502-3667
Tel:  (337) 234-7000
Fax:  (337) 237-0344

**ATTORNEY FOR CON DIVE, LLC, LLOG EXPLORATION COMPANY, INC., LLOG EXPLORATION OFFSHORE, INC., LLOG EXPLORATION & PRODUCTION COMPANY AND LLOG ENERGY, LLC**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing has this date been filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system to all parties that have consented to receive service electronically.  I also certify that the above and foregoing has this date been forwarded by either facsimile, hand delivery, Federal Express, or U.S. Mail, postage prepaid and properly addressed to the non-CM/ECF participants on this the 19th day of May, 2011.


 */s/ J. Daniel Rayburn, Jr.*
J. DANIEL RAYBURN, JR.